Now turn to 19-1074 Ellis v. Liberty Life Good morning, your honors. One of the most fundamental tenets of ERISA jurisprudence is that the plan sponsor gets to choose the terms of the plan it wants to adopt. And once those terms are chosen, they have to be enforced as written. The Supreme Court in the Himeshoff case explained why that that is so important. The Himeshoff court said that adherence to the terms of the plan is the linchpin of a system that's not so complex as to discourage employers from adopting plans in the first place. In this case, the district court essentially ignored several very important plan terms, starting with the plan's choice of law provision. Now the 11th Circuit, the 8th Circuit, the 9th Circuit, and the 5th Circuit have all held that in the ERISA context, choice of law provisions are enforceable if they're, unless they're unreasonable or fundamentally unfair. And the 9th Circuit's explanation in Wang is really the most extensive explanation of why that is. As the Wang court held, and all those cases hold, there's nothing unreasonable or unfair about choosing an employer's home state for that law to govern. That makes all the sense in the world. It's not unfair in any way. And as Wang said, choosing an employer's home state is a great benefit to the plan. It gives the plan the ability to avoid uncertainty and avoid excess costs. And it's, with respect to that certainty results in reduced costs, reduced premiums for them. And the case that the Wang court relied on for these premises was the Supreme Court's decision in the Carnival Cruise case versus Shoot. And in that case, the court was talking about a choice of forum provision, an analogous choice of forum provision. And it echoed those same, those same concerns in terms of a forum selection cause having the salutary effect of certainty and ultimately redounding to the benefit of the passengers on the cruise, or in this case, the employees. And if you look at those analyses, and then you look at the Himeshoff decision, an ERISA case from the Supreme Court that applied a very similar reasonableness test to whether to apply a contractual limitations provision in a plan. And the Himeshoff court said, we're going to apply plan provisions as written unless it's unreasonable to do so. And talked about the particular importance of doing that in the ERISA context using that linchpin language that I talked about earlier. If you look at all those cases, I mean, I think that's really the only test that makes sense in terms of whether to apply a contractual, a choice of law provision in an ERISA plan. And it I think what the district court did here, you're essentially using state law principles to do sort of an end run around ERISA preemption and to impair the uniformity and predictability interests that are at the heart of ERISA. I mean, if you can use the mere fact that a state has contrary law to essentially get around ERISA preemption or to take the choice of law provision out of the policy, I don't see why a state can't or a court sitting in a forum state can't do that for any plan provision. And when that starts to happen, what you've got is exactly what ERISA tries to prevent, which is one plan with multiple state laws controlling it. That's exactly what you don't want. And that does not work to the benefit of plan beneficiaries and participants. Just the works to further the interest of beneficiaries. Of course, in this case, you don't even, the Colorado discretionary ban, even without the choice of law clause, the choice of law provision doesn't apply by its very terms. That statute only applies to policies that are issued in Colorado after 2008. This policy was not issued in Colorado. It was issued in Pennsylvania, as the policy states on its face, delivered in Pennsylvania. The district court cited no facts that are contrary to what's written right in the plan, so he essentially ignored that plan provision as well. The only thing he cited was a district of Colorado case, the Schaefer case, whose analysis on that point I think is simply wrong. Schaefer indicated that it's somehow in beneficiaries' best interest for apparently the same plan to be governed, for the same plan to be, policy to be issued in every state where an employer might have employees. I mean, that's exactly wrong. That's not in beneficiaries' best interest. It's in their interest to have the plan governed by one set of laws, because that's going to encourage the employer to adopt those plans. Additionally, the Eighth Circuit in the Brake case discussed the fact that in the context of group insurance, a group policy is issued in the state where the employer is domiciled. That just makes fundamentally good sense. And again, it says it right here on the policy's face. It was issued in Pennsylvania, not in Colorado. The only document at issue here is the group policy. And the only entities that Colorado can regulate are insurance companies, companies that are specifically engaged in the business of insurance. So it has to be Liberty's issuance that counts. And there's no evidence whatsoever, anywhere, that Liberty issued anything to anyone in Colorado. It issued the policy in Pennsylvania. Also, it issued the policy before 2008. This court has held that the discretionary ban should not be imposed retroactively, because you impair contractual rights. In 2005, Liberty issued this policy to Comcast and contracted for deferential review with the discretionary clause in there. The Colorado ban was enacted in 2008. To apply here would impair those rights. The district court talked about amendments to the policy. The statute doesn't speak to amendments. It doesn't speak to renewables. It speaks to issuance, policies issued in Colorado. If the legislature wanted to adopt a statute that said policies issued, renewed, or amended in Colorado are subject to the ban, it could have done so. Some states have done that. Colorado has not. This policy was not issued in Colorado, and it was not issued before 2008. The court also, and again, I spoke of this earlier, the only document that matters is the group policy. The court referenced a summary plan description that the employer apparently had issued. And it's important to note that whatever documents that the employer in its duties as plan administrator issues have nothing to do with Liberty. That misunderstands the division of labor between an insurance company, claims administrator, and a plan administrator under ERISA. Providing summary plan descriptions and notices of benefits is the plan administrator's job. The insurance company, in this case Liberty, agreed to do only those things set forth in the four corners of the policy. It's an integrated document. There's no evidence anywhere that they agreed to do anything else. That's their duty, and that's what their duties and obligations is limited to. So again, that's the only document that's important here. If the court doesn't have any more questions on the standard of review, I'll move to the other plan provisions that the court essentially ignored here. And those are the important proof provisions in the policy. No matter what standard of review you apply to review Liberty's decision, Liberty had an obligation to enforce those proof provisions, including the provision that said benefits are going to end when there's no more continued proof of disability. And if we look at the position that Ms. Wright found herself in, in late 2013, she found herself in a position of not having sufficient proof of disability and having to enforce that provision. At that time, typically the most useful thing, pieces of evidence for administrators to look at when assessing disability are contemporaneous medical records. That gives us a picture of what's going on with the claimant at any given snapshot in time. The policy specifically says, chart notes, medical records, that's proof of disability. As we get to late 2013, there were none of those. Mr. Ellis had stopped treating back in May of 2013. He didn't have any, so Ms. Wright didn't have any contemporaneous medical records to look at in terms of assessing his situation. She didn't have any updated opinions from treating physicians because he stopped treating. He didn't treat anyone despite the requirements in the policy for appropriate care and treatment by physicians. She had also had Dr. Crouch and Dr. Wager both indicate that the 24 seconds of asystole that Mr. Ellis experienced could not possibly have led to the brain damage theory that he espoused. And that's not to say that there's a causation requirement in the Mr. Ellis had was caused by mental illness. That would have been limited to 24 months under the policy. It was important for Liberty to assess that. Now, of course, as it turns out, he couldn't have recovered benefits for mental illness because he never treated for it, and the policy requires treatment. But again, in assessing those issues, it was important to get at that. Additionally, simply the notion of objective analysis connotes the idea that if something cannot be caused by something else, then one moves on to try to determine another cause, whether it be depression, whether it be effort, whether it be somatic exaggeration, or what have you. These were important points for Liberty to assess during the claims process. So what Ms. Wright did was exactly what she should have done. She got an independent, she asked a vendor to choose an battery of tests to interview Mr. Ellis and to look at the entire record, which he did. And Dr. Gantt found that Dr. Helfenstein's 2012 battery was both outdated and inadequate in terms of validity testing, which Dr. Gantt and Dr. Belliveau later talked about are essential to assessing cognitive impairment in the context of potential secondary gain. Dr. Gantt's own tests, he did a robust validity assessment, and his own tests revealed overwhelming evidence of symptom exaggeration that he ascribed to somatic exaggeration or what have you. So Ms. Wright did the only thing she could have with no proof confronting her in late 2013 and terminated benefits. Now there's a number of things Mr. Ellis could have done on appeal to prove his claim. He could have sought treatment. Depression had been noted as a potential cause. Someone trying to get better, return to work, might go seek treatment for depression and see if that helped. He might have chosen a second evaluator or a neuropsychologist who's going to do an objective evaluation to review his claim. He might have submitted contemporaneous medical records. What he did was go back to Dr. Helfenstein and Dr. Helfenstein didn't address any of Dr. Gantt's critiques about the adequacy of the validity battery that he assessed. In fact, he used essentially the same validity battery except the one test that Dr. Belliveau later discussed as being the most sensitive test to effort, he didn't use, the WMT test. Well, counsel, can I just stop you there because your time is winding down. Let me just understand the order of your arguments. I mean, I guess you're saying that the district court erred in its choice of law analysis. Pennsylvania law should apply and Pennsylvania doesn't have a bar on discretionary clauses. So what happens then with the case? So the case should have been reviewed as the judge initially did under the arbitrary and capricious standard of review. Okay, and are you asking this court to perform that or to remand the case? We already know what the district judge thinks about arbitrary and capricious review. I think, I don't think there's any need to remand it. He held that it passes muster under arbitrary and capricious review and so. Our review is de novo anyway. And your review is de novo anyways, your honor. So you can do whatever you or modify it. But it is crystal clear. And the point I was just making is that the decision withstands any standard of review. But certainly the deferential standard of review, it's not even a close call. And I would ask you to find that. And I'd like to reserve the 45 seconds I have left. May it please the court, my name is Sean McDermott. I represent the appellee, Micah Ellis in this case. There are a number of different issues that we're dealing with in this case. We're dealing with. I want to make sure you're being picked up by the mic. Is he speaking loud enough? Speak into the mic. Okay, I apologize for that. Thank you. There's a number of different issues that we could address. We are, we're dealing with a district court situation where two different judgments were rendered under two different standards of review. That is the primary thrust of this case. But with regard to the facts, I want to hit at this point before I face any questions, if I may, a very significant issue that Liberty overlooked and the district court overlooked as well. And that has to do with the evidence that was presented to Liberty after the claim was terminated. As opposing counsel has suggested, there wasn't very much evidence submitted. That is not true. There was another neuropsychological evaluation completed by Dr. Helfenstein. He again concluded that there was cognitive impairment. Beyond that, there was a SPECT scan that was performed. And a SPECT scan is a single photon emission computed tomography. This is a nuclear medicine study. It measures the blood flow of the brain. It looks at the activity in the brain. This is material objective evidence that was submitted to Liberty as part of the internal appeal that they never looked at. Our brief discusses the fact that they didn't look at it. Their own claim file shows that they did not look at it. The only reference by opposing counsel or Liberty, I should say, in the reply brief is that the claim notes were somewhat confusing because they couldn't figure out how to play it. But it was suggested by Liberty in the reply brief that that doesn't mean that they didn't review it. This is an ERISA case. We are stuck with the record. The lower court was stuck with the record. This court is stuck with the record. And the record does not show in any sense that this video was reviewed. And I'm talking about the SPECT scan itself, but more importantly the video that was submitted as part of the appeal. This was a video of Dr. Hibskind. He is the gentleman, or I should say the neurologist, who conducted at the company known as Seroscan a SPECT scan. This video is basically of prior counsel, Mr. Cederberg, who was retired and I since took over the case. He basically did a direct examination of Dr. Hibskind and he submitted that with the record. And that was never reviewed by the insurance company. We know that it was never reviewed because Dr. Beliveau, who has been mentioned by opposing counsel during the internal appeal process, doesn't discuss it. He does make a comment at one point in his report that he suggested the SPECT scan may not necessarily be applicable to evaluation of brain injury due to hypoxic ischemic events and that the cognitive and psychological assessment methods used during the neuropsychological examination represent a more direct process of determining the examinee's functional status. But later in his report, he actually deferred in his report to a consulting neurologist or a radiologist. He was basically telling the insurance company that I'm not qualified to read these things. And so he recommended or he deferred to a neurologist. There was no need to refer to a neurologist. We had a neurologist opinion in the record. Dr. Hibskind's video that was submitted as part of the internal appeal process. So to the extent that Dr. Beliveau was was deferring to a neurologist, we know what the neurologist had to say about this. The SPECT scan video itself we know was not reviewed. The record shows that. There's no suggestion that the district court judge reviewed the video as well. But I don't think that Judge Babcock needed to do that. He did not do that in the first judgment. He did not do that when he rendered the second judgment. Unfortunately, if this, if I may, on the issue of remand, this ties into this argument that we have a prior judgment that was rendered under the arbitrary and capricious standard of review. Plaintiff has not had a chance to appeal that decision. We filed a motion to reconsider and the judge at that point decided that he had applied the wrong standard of review and under the correct standard of review, ruled then in favor of plaintiff. Had that motion to reconsider not been granted, we certainly would have appealed that now vacated judgment. So plaintiff, I guess, is at somewhat of a disadvantage here if this court is going to actually conduct a de novo review of that prior order, because we have not been given the opportunity to argue why it is arbitrary and capricious. I can certainly do that. You're saying there was no consideration by liberty of the spec scan? Judge, I'm sorry, Dr. Beliveau reviewed the spec scan itself, but not the video, not Dr. Well, he thought that the whole science behind it was irrelevant to this condition, to the alleged condition of your client. Wouldn't that be enough if an expert says this is irrelevant? Then can't the insurer rely on that? Not if you don't look at the evidence, and here's why. Because Dr. Hipskin explains in his video why it is relevant. He specifically explains, he goes through in this 22 minute video and explains why it's relevant and how it correlates. Why it's relevant to hypoxic injury? Yes, he discusses that in the video. I watched the video again two days ago. Dr. Hipskin goes into all of that. He discusses the nature of the test, what it does, the fact that there's two portions of this test, and while he's doing this in the video, he has a screen up, and it shows the slices of the brain from the two different tests. There's a resting test that is done that gets a baseline test, and then they do what I call an active test, where they actually stimulate the brain and try to judge the executive functioning of the brain during activity to try to simulate work conditions, and he explains that on the video, and then he correlates all of that back. Okay, does Liberty have to accept that expert opinion, or can it accept the opinion of Dr. Bellevue, who says this type of study is not met life? The Supreme Court told us in 2009 that they have to weigh all evidence. How do you determine whether they fairly weighed it? If they have conflicting experts and adopt the view of one, what more does the insurer have to do? I guess the point that I'm making is they didn't review the evidence at all, so there was no weighing of the evidence. They didn't look at it. Well, if they have an expert saying this evidence is irrelevant, and they accept that view, then they have to look at what their expert says is irrelevant anyway. Well, what Dr. Bellevue says in his report is that he questions his relevance as to, and let me turn back here. Hypoxic injury. Hypoxic injury, exactly. Which was the claim here. That was the claim, is that his loss of cognitive function was due to this hypoxic injury, this 20 seconds or whatever it was. I actually respectfully disagree. That is the issue as Liberty has attempted to frame it. There is no causation element here. The plaintiff need not show that his disability is due to any particular event, and Mr. Ellis and Dr. Helfenstein and none of the treating physicians have ever said that his cognitive dysfunction and all the other symptoms that he is experiencing is due to that 24 second asystole when he flatlined in the emergency room. In fact, what Dr. Helfenstein said in his reevaluation or his second neuropsychological evaluation is that all three doctors, and he mentions Dr. Zacarias and Dr. Hadley, that it is a combination of everything that occurred in the hospital that day, including the pulmonary emboli, the blood clots in the lungs, the pneumonia that he had, the administration of the nitroglycerin. So it doesn't matter what the cause was. Does the spec report measure competence? Does it measure how well the brain is functioning? Yes, that's exactly what it does. How does it do that? It does it through this, as I was attempting to explain, and I guess my answer to that is, as burdensome as it would be, because it's in the record, you have the video. There's a 22 minute video of the doctor explaining exactly what the test does. And it says it shows that your client is deficient and cannot perform certain tasks, or just shows some physical abnormality? It shows, if you will, hot spots. It shows blood flow and what happens when the brain is functioning. And then under the active test, they're specifically trying to simulate work environments. And then they do another test under that. And it shows, and Dr. Hipskin explains in this video, why that reveals objectively that there's an issue with the brain, that you have cognitive decline. And he opines in this video that it makes sense that he has cognitive impairment, that he's no longer able to work. It's all explained on this video that the insurance company never looked at. It's all in there. I don't know how else to explain it except for to play the video for the court. But what is undeniable is that the insurance company never considered it. Now, I'd like to turn, if I may, if I can, to the choice of law question. And as much as it pains me to say this, the first issue and the primary issue that the appellant has raised in this litigation is that the court did not properly apply the choice of law analysis. I went back through the briefs, especially after I read the reply brief, where Liberty makes the argument in response to our position in the answer brief, that the choice of law question boils down to a substantive law issue versus a procedural issue, that we hadn't raised that in the lower court. And I started to think, well, wait a minute, why didn't we? And again, I wasn't involved in that briefing, but I went back and I looked at the briefing. The fact of the matter is, the choice of law issue was not raised at the lower court. I did a search two days ago of all the briefing that was done at the lower court, and the phrase choice of law does not appear. It didn't happen. What Liberty's argument was at the trial court level was that the Colorado statute, which bans these discretionary clauses, could not be applied retroactively. That's what they argued. And the court initially agreed, Judge Babcock initially agreed in his first judgment that it could not be applied retroactively. There is only one passing reference in that entire briefing at the lower court in one sentence in the response to the motion for summary judgment that the policy was issued in Pennsylvania. But that was offered in the context that in discussing the phrase issued in with regard to the statute, there was no choice of law analysis done by the court, and the issue was not raised. Did you raise that in your answer brief? And this is the part that I apologize for when I started this. We did not. And because I didn't realize until I was looking at the reply brief, when they tried to make the argument against us on the substantive versus procedural issue, that I realized, again, we weren't involved before that, wait a minute, this had never been argued before. So, so this is the first time they're hearing this point, that it wasn't preserved. This is the first time that, I'm sorry, I didn't catch that. This is the first time that Liberty is hearing your argument that the choice of law issue was not preserved. That is correct. I will admit that. That it wasn't properly preserved. They should have an opportunity. I mean, that's why you're supposed to raise it in your brief so it can be vetted a Yes, I, I fully understand. And it may be appropriate to allow supplemental briefings, but we'll see what counsel says. I'm going to give counsel additional time to address that because it comes as a surprise. And I'm happy to argue the choice of law issue as it stands. You've got a minute and a half. Okay. Well, it is contained within the briefs, but this issue boils down to procedural versus substantive. The case law says that choice of law provisions in contracts are generally understand to incorporate only substantive law and not procedural law. The ban on discretionary clause has nothing to do with substantive law. This, this is all procedure. This is a, the standard of review that a court applies after the case is done in the ERISA context and after the analysis is done and after the claim is fully administered. And Colorado's attempt to change or the actual change in the law is procedural since the standard of review did not control Ellis's claim when it was administered and decided by Liberty. Standard of review questions are procedural, not substantive. And so there's, it really should end the analysis there. And explain why, why don't you still have a choice of law? If it's just procedural, if it's a pure matter of procedural, then we should apply federal law, not the state law. If it's in federal court, you apply federal procedure law as a, as a general matter. I'm not sure what difference it makes whether this is procedural or substantive. Well, because it's in the insurance context and with regard to ERISA, the ERISA law specifically spell out that, that state laws that are saved, that regulate insurance are saved from preemption. Yeah, the question is what state law? That's the whole issue here. Sure. If, if this were, if everything had happened in Colorado and the contract had said this should be interpreted under Colorado law, then Colorado law would prevail over ERISA. I think that's probably correct, but that's not the issue here. It's does Colorado law prevail over ERISA? What's Pennsylvania law? That's the choice of law issue here. And there's pretty strong authority. The Supreme Court likes simplicity in these matters, a uniform, the sort of things that were raised. He didn't raise the decision in Kennedy of the Supreme Court, which I think is even stronger in that regard. I'll let you respond briefly, unless there's another question that'll be your own. Well, with, with regard to the Pennsylvania law, there, there is no conflicting law in Pennsylvania that, that, that bans or does not ban discretionary clauses. There's no expression by the legislature in Pennsylvania whether they, they've even thought about this. And so there's really no, there's really no conflict. And when you, when you look at this as a procedural issue, this case pended in Colorado, you have everything that occurred with regard to this, this claim occurred in Colorado. Mr. Ellis worked for Comcast for 18 years. He was insured under this plan and this policy for 18 years in the state of Colorado. There's no evidence he's been anywhere near Pennsylvania. Thank you, counsel. Thank you. Can I briefly address the SPECT issue? Yes. And then I'll give you extra time. Okay. Thank you, Your Honor. What Dr. Belliveau said was that, was that SPECT imaging has, has not been established as something that can determine brain damage from hypoxic injury and that it doesn't measure functionality as you got to, Judge Hart, at all. It doesn't, it doesn't measure what you can do and what you, what you cannot do. And all of the information that plaintiff submitted supports that. There's nothing in there that says it's, it can demonstrate hypoxic injury, which is what the theory was here. It was Ellis's own theory that, that he adopted, that he then went out to support that Dr. Helfenstein initiated. Is it correct that he could have obtained benefits even if it was caused by another, even if there was a different cause? No. I mean, mental, the only other cause would be, would be mental illness. I mean, and he couldn't, he couldn't obtain benefits for that because he didn't seek treatment. He would need, would need to seek treatment. And that's, you know, again, the cause is important in terms of, you know, they say it's brain injury. It can't be brain injury. So what is it? And Dr. Gant, Dr. Belliveau concluded that the only evidence was the neuropsych evidence, and it was poor effort. I thought SPEC could show brain injury, just not hypoxic. Correct. That's correct. And, but there's, there was never any indication of any other mechanism or event that could have resulted in the brain injury that, that they, that they ascribed. And did Liberty refer to the SPEC to Belliveau's, Belliveau's view of the SPEC study? In its letter, in its, in its uphold letter, it certainly did. It said it rejected the SPEC because of Dr. Belliveau. Exactly. It quoted Dr. Belliveau's points on that. And, and in fact, factually speaking, the video simply is Dr. Hipskin explaining the, the, the test that Dr. Belliveau read. And when it came in, Ms. Berry said to the plaintiff's attorney, you know, we've had issues with these videos in terms of the software not being able to play them. So can you send a transcript of the, of the video? Because in terms of when you transfer it to, you know, from one place to another, and, and again, plaintiff has the burden. And was that. And they never submitted the transcript. Okay. Despite Ms. Berry's, Ms. Berry's request. Address preservation. Yes. So I, I did not handle this case below either. So this is again, as you alluded to, a surprise to me, Your Honor, but certainly the district court addressed choice of law. The district court went through an entire analysis using Colorado choice of law rules to, to, to, to analyze, you know, which, which law he, he should apply. Mr. McDermott said the district court didn't address choice of law at all. So the district court addressed whether it should apply, it should apply Pennsylvania or Colorado law? It, it, it applied Colorado law under the restatement that it, that it, that it chose. It specifically said it was not going to apply Pennsylvania law. Okay. But if, if there's a further briefing to be had on that issue, I'm happy to do that. We'll, we'll think about that. Okay. Thank you. Thank you, counsel. Case submitted. Counsel are excused.